Mark A. HOPKINSON,
Petitioner–Appellant,

v.

Duane SHILLINGER, and the Attorney
General of the State of Wyoming,
Respondents–Appellees.

No. 86–2571.

United States Court of Appeals,
Tenth Circuit.

Oct. 24, 1989.

Rehearing Denied Dec. 1, 1989.

Daniel J. Sears, Denver, Colo. (Leonard D. Munker, Public Defender, and Norm Newlon, Asst. Public Defender, State of Wyo., Cheyenne, Wyo., with him on the briefs), for petitioner-appellant.

Terry L. Armitage, Asst. Atty. Gen. (Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., with him on the briefs), State of Wyo., Cheyenne, Wyo., for respondents-appellees.

Before HOLLOWAY, Chief Judge, and McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY and EBEL, Circuit Judges.

## ON REHEARING EN BANC

STEPHEN H. ANDERSON, Circuit Judge.

Mark A. Hopkinson was convicted in Wyoming State Court on four counts of first degree murder and two counts of conspiracy to commit first degree murder. The first three counts of murder arose out of his hiring Michael Hickey to bomb Vincent Vehar's home. That bombing killed Vehar, Vehar's wife, and one of his sons; another son was injured in the blast but survived. The fourth murder count was for procuring the killing of Jeff Green. Hopkinson was sentenced to life imprisonment for each of the Vehar murders, and to death for the murder of Green. *See Hopkinson v. State*, 632 P.2d 79 (Wyo.1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982) (*Hopkinson I*). Hopkinson was also convicted in the same trial of conspiracy with Harold James Taylor to commit the first degree murder of Vehar and conspiracy with Hickey to commit the first degree murder of William Roitz.

On appeal Hopkinson's death sentence for the murder of Green was vacated by the Wyoming Supreme Court. *Id.* A second sentencing proceeding was conducted and Hopkinson was again sentenced to death. The Wyoming Supreme Court affirmed that sentence. *Hopkinson v. State*, 664 P.2d 43 (Wyo.), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983) (*Hopkinson II*). After subsequent unsuccessful challenges in state court[1] Hopkinson sought federal habeas relief with respect to his convictions for first degree murder and his sentence of death. His petition was summarily dismissed by the district court. *Hopkinson v. Shillinger*, 645 F.Supp. 374 (D.Wyo.1986).

A panel of this court unanimously affirmed the district court on virtually all issues, and affirmed with one dissent on the subject matter of this en banc review. *Hopkinson v. Shillinger*, 866 F.2d 1185 (10th Cir.1989), *reh'g granted*, March 23, 1989. The court thereafter agreed to consider en banc whether certain remarks by the prosecutor in the second sentencing proceeding violated the rule set out in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and, if so, the standard of review to be applied to such a violation, and whether applying that standard Hopkinson's death sentence must be vacated. The court also directed the parties to address whether *Caldwell* can be applied retroactively to this case. *See Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). On the latter question we conclude that *Caldwell* does apply. On the former, we hold that Hopkinson's death sentence was not imposed unconstitutionally.

---

1. The Wyoming Supreme Court affirmed the denial of Hopkinson's motion for a new trial in *Hopkinson v. State*, 679 P.2d 1008 (Wyo.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984) (*Hopkinson III*). The denial of his first petition in state court for post-conviction relief and writ of habeas corpus was affirmed by the Wyoming Supreme Court in *State ex rel. Hopkinson v. District Court, Teton County*, 696 P.2d 54 (Wyo.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985) (*Hopkinson IV*). That court also upheld the denial of his motions

for reduction of sentence and stay of execution in *Hopkinson v. State*, 704 P.2d 1323 (Wyo.), *cert. denied*, 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985) (*Hopkinson V*). The denial of his second petition filed in state court for writ of habeas corpus was affirmed by the Wyoming Supreme Court in *Hopkinson v. State*, 708 P.2d 46 (Wyo.1985) (*Hopkinson VI*). The denial of his request for discovery of grand jury testimony was affirmed in *Hopkinson v. State*, 709 P.2d 406 (Wyo.1985) (*Hopkinson VII*).

## I.

Because *Caldwell* was decided in 1985, two years after Hopkinson's second capital sentence became final, principles of nonretroactivity may apply to this collateral review. *See Teague v. Lane,* —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). However, we must decide first whether the issue is properly before us.

### A.

■ The state has interposed no defense to the *Caldwell* issue on nonretroactivity grounds, thus raising a preliminary question of waiver. *See* opinions of Justices Brennan and Blackmun respectively accompanying and dissenting to remand in *Zant v. Moore,* —— U.S. ——, 109 S.Ct. 1518, 103 L.Ed.2d 922 (1989); *Penry v. Lynaugh,* 109 S.Ct. at 2963 (Stevens, J., concurring and dissenting in part). We hold that the nonretroactivity defense is not waived, and should be considered.

Our analysis of retroactivity in this case is based upon and dictated by the "novel threshold test for federal review of state criminal convictions," announced in *Teague. Teague v. Lane,* 109 S.Ct. at 1084 (Brennan, J., dissenting). It was not previously available to the state. Arguably, the state could have raised the defense of nonretroactivity on other grounds, but they would have been largely irrelevant to the analysis required by *Teague.* Furthermore, the retroactivity approach adopted in *Teague* was not applied in the capital sentencing context until June of this year. *Penry v. Lynaugh,* 109 S.Ct. at 2944. Finally, and more fundamentally, we *sua sponte* raised the issue in this case because the very scope of the writ of habeas corpus, and therefore our power to grant relief, is implicated. *Cf. Teague v. Lane,* 109 S.Ct. at 1069. Pursuant to our order, the parties have fully briefed the question.

### B.

■ Under *Teague,* new rules cannot be applied in cases on collateral review, including capital cases, unless they fall into one of two exceptions. *Teague v. Lane,* 109 S.Ct. at 1073, 1075; *Penry v. Lynaugh,* 109 S.Ct. at 2944.

The initial question, therefore, is whether *Caldwell* erected a "new rule" when it declared that "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi,* 472 U.S. at 328–29, 105 S.Ct. at 2639.

In *Penry* the Supreme Court described "new rules" as follows:

"As we indicated in *Teague,* '[i]n general ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.' [*Teague v. Lane,* 109 S.Ct. at 1070.] Or, '[t]o put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.' *Ibid.* (emphasis in original). *Teague* noted that '[i]t is admittedly often difficult to determine when a case announces a new rule.' *Ibid.* Justice Harlan recognized 'the inevitable difficulties that will arise in attempting "to determine whether a particular decision has really announced a 'new' rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law."' [*Mackey v. United States,* 401 U.S. 667, 695, 91 S.Ct. 1160, 1181, 28 L.Ed.2d 404 (1971)] (separate opinion of Harlan, J.) (quoting *Desist v. United States,* 394 U.S. 244, 263 [89 S.Ct. 1030, 1041, 22 L.Ed.2d 248] (1969) (Harlan, J., dissenting)."

*Penry v. Lynaugh* 109 S.Ct. at 2944.

Applying the "breaks new ground" description to the subject matter of *Caldwell* as a general proposition, the initial impulse is that it is not a novel constitutional idea that a jury should understand its role and responsibility in a capital sentencing pro-

ceeding. The majority opinion in *Caldwell* does not state that it is announcing a new rule. That opinion also points out, and Hopkinson reminds us, that state supreme courts have routinely considered it error for a prosecutor to mislead a jury into thinking that the ultimate determination of death rests with others. *Caldwell v. Mississippi*, 472 U.S. at 333–34, 105 S.Ct. at 2641–42. Appellant's Brief on Issue of Retroactivity at 7. Thus, Hopkinson reasons, a constitutional rule on the point would not break new ground and it would not impose a new obligation on the states. *See Dugger v. Adams*, — U.S. —, n. 3, 109 S.Ct. 1211, n. 3, 103 L.Ed.2d 435 (1989).

However, we effectively reached a different conclusion in our recent decision in *Dutton v. Brown*, 812 F.2d 593, 596 (10th Cir.) (en banc), *cert. denied*, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). In *Dutton*, a *Caldwell* issue was raised for the first time in a federal habeas proceeding challenging a death sentence imposed in state court. Although failure to raise the issue in state court constituted a procedural default, we held that cause for the default existed on the ground that *Caldwell* announced a new rule. Our language in *Dutton* does not suggest that *Caldwell* was dictated by past precedent:

> "We believe cause existed for the procedural default because trial counsel, at the time of trial in 1979, *could not have known that the prosecutor's remarks might have raised constitutional questions. The law petitioner relies on did not become established until the Caldwell decision in 1985.* We cannot expect trial counsel 'to exercise *extraordinary vision* or to object to every aspect of the proceeding *in the hope that some aspect might mask a latent constitutional claim.*' *Engle v. Isaac*, 456 U.S. 107, 113, 102 S.Ct. 1558, 1564, 71 L.Ed.2d 783 (1982). In *Reed v. Ross*, 468 U.S. 1, 17, 104 S.Ct. 2901, 2911, 82 L.Ed.2d 1 (1984), the Court ruled that cause exists for

defense counsel's failure to raise an issue when a subsequent Supreme Court decision articulates a constitutional principle *that had not been recognized previously.* Consequently, the failure of counsel to raise a constitutional issue *reasonably unknown* to him satisfied the 'cause' requirement. *Id.* at 14, 104 S.Ct. at 2909."

*Id.* at 596 (emphasis added).

Echoing the notion that *Caldwell* was "new," the dissent to the panel opinion in this case comforted the trial court and the prosecution with regard to the alleged error by saying: "In fairness to the court and counsel, the sentencing proceeding was three years before *Caldwell* was decided...." *Hopkinson v. Shillinger*, 866 F.2d at 1238 (Logan, J., dissenting).

We are not alone in the view expressed in *Dutton* that the novelty of *Caldwell*'s Eighth Amendment application provided cause for a defendant's failure to raise the issue in state court prior to *Caldwell.* The Eleventh Circuit took the same position in *Adams v. Dugger*, 816 F.2d 1493, 1495–1501 (11th Cir.1987), *rev'd, Dugger v. Adams*, — U.S. —, 109 S.Ct. at 1211, 103 L.Ed.2d 435 (1989) (*Caldwell* claim prior to *Caldwell* was "so novel as to have no reasonable basis in existing precedent." *Id.* at 1500), and its initial opinion in that case, *Adams v. Wainwright*, 804 F.2d 1526, 1530–31 (11th Cir.1986), *rev'd, Dugger v. Adams*, 109 S.Ct. at 1211 (1989), upon which we relied in *Dutton.*

The Supreme Court duly noted our position, along with those of the Eleventh and Fifth Circuits,[2] in its reversal of the Eleventh Circuit on other grounds. *Dugger v. Adams*, 109 S.Ct. at 1214, n. 3. It declined to pass directly on the novel claim argument, holding that the defendant, Adams, was procedurally barred because he "plainly had the basis for an objection and an argument on appeal that the instructions

---

**2.** The Fifth Circuit in *Moore v. Blackburn*, 774 F.2d 97, 98 (5th Cir.1985) (alternative holding), *cert. denied*, 476 U.S. 1176, 106 S.Ct. 2904, 90 L.Ed.2d 990 (1986), concluded that "a competent attorney should have been aware of" this type of claim prior to *Caldwell.* But that position has since been explained and limited in *Sawyer v. Butler*, 881 F.2d 1273 (5th Cir.1989) (en banc).

violated *state* law." *Id.* at 1215 (emphasis added).

One way, perhaps, to reconcile *Dutton* with our holding here is to say that the analysis of a new rule for purposes of cause, at least as we saw it then,[3] and analysis for determining a new rule for nonretroactivity purposes, are not identical. While the Supreme Court has left open the precise definition of cause, *see Dugger v. Adams,* 109 S.Ct. at 1215, it has stated that one way a petitioner can establish cause is by showing that "a constitutional claim is so novel that its legal basis is not reasonably available to counsel." *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). In *Teague* a new rule for nonretroactivity purposes is described as a result which is not *"dictated* by precedent existing at the time the defendant's conviction became final." *Teague v. Lane,* 109 S.Ct. at 1070 (emphasis in original). Comparing the two definitions, there is far more ground for congruence than for distinction. One might argue that a "reasonably available legal basis" is less demanding than a "dictated by precedent" test for nonretroactivity purposes. But even if that is so, a holding that a claim is so novel that there is no reasonably available basis for it, thus establishing cause, *must* also mean that the claim was too novel to be *dictated* by past precedent. Thus, we cannot simply dismiss our *Dutton* dicta as irrelevant to the present question.

Reexamination of whether *Caldwell* broke new ground does not persuade us to a different view than that expressed in *Dutton.* As the Eighth Circuit explained in detail in *Adams v. Dugger,* 816 F.2d at 1495, 1498–1500, and the dissent pointed out in *Caldwell,* 472 U.S. at 347–52, 105 S.Ct. at 2649–51 (Rehnquist, J., dissenting), Eighth Amendment jurisprudence of the Supreme Court prior to *Caldwell* did not visibly compel the outcome in *Caldwell.* To the contrary, *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), and *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), inclined in the opposite direction, and had to be specifically addressed and distinguished in *Caldwell.* The underpinning cited by the majority as justification for its holding in *Caldwell* was the "Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Caldwell,* 472 U.S. at 340, 105 S.Ct. at 2645, quoting *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion). A command of that generality may justify any result the Supreme Court wants to reach in a particular case, but it does not adequately describe or compel a result in any specific matter.

Additionally, state court proscriptions of conduct similar to that involved in *Caldwell* did not necessarily establish prior to *Caldwell* that such conduct violated the Eighth Amendment. *See Dugger v. Adams,* 109 S.Ct. at 1216 ("We agree with respondent and the Court of Appeals that the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution."); *Adams v. Dugger,* 816 F.2d at 1499 n. 6.[4]

---

**3.** *Harris v. Reed,* —— U.S. ——, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Dugger v. Adams,* 109 S.Ct. at 1211; *Teague v. Lane,* 109 S.Ct. at 1060, and other very recent Supreme Court cases may have compelled a different analysis in *Dutton.*

**4.** It is a necessary element of a subsequently available *Caldwell* claim that the challenged remarks or instructions were objectionable under state law. *See Dugger v. Adams,* 109 S.Ct. at 1217. Hopkinson's counsel alleged at oral argument that the challenged remarks violated the Wyoming constitution in the same way that it violated the United States constitution. Trans. of Oral Argument at 8, and that the reference to appellate review was improper because it did not inform the jury of the limitations of appel-

late review. *Id.* at 48. In that respect, the alleged error by omission, rather than commission, is similar to that asserted in *Dugger v. Adams. Dugger v. Adams,* 109 S.Ct. at 1214. As we have previously noted, defense counsel did not interpose an objection on those state law grounds. Failure to object on those grounds could have been cause for the Wyoming Supreme Court to apply a procedural bar later, thus providing a basis under *Dugger v. Adams* for foreclosing Hopkinson's *Caldwell* claim in this federal habeas proceeding. *See id.* However, the Wyoming Supreme Court expressly declined to apply a procedural bar on any ground with respect to Hopkinson's *Caldwell* claim, and addressed that claim on the merits.

Hopkinson points out that we have considered *Caldwell* claims in other cases without raising the issue of nonretroactivity. *See Parks v. Brown,* 860 F.2d 1545 (10th Cir.1988) (en banc), *cert. granted on other grounds,* — U.S. —, 109 S.Ct. 1930, 104 L.Ed.2d 402 (1989); *Dutton v. Brown,* 812 F.2d 593 (10th Cir.) (en banc), *cert. denied,* 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987); *Coleman v. Brown,* 802 F.2d 1227 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). However, those cases were decided prior to *Teague,* and in any event, no *Caldwell* violation was found. Cases in other circuits, cited by Hopkinson, where relief on the basis of *Caldwell* has been granted, were also decided prior to *Teague. See, e.g., Wheat v. Thigpen,* 793 F.2d 621 (5th Cir.1986), *cert. denied,* 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987); *Mann v. Dugger,* 817 F.2d 1471 (11th Cir.1987), *reh'g granted,* 828 F.2d 1498, *on reh'g en banc,* 844 F.2d 1446 (1988), *cert. denied,* — U.S. —, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989); *Adams v. Wainwright,* 804 F.2d at 1526. While we acknowledge that a fortuity of timing placed previous habeas petitioners, here and elsewhere, in a different position than Hopkinson, nonretroactivity does not apply to *Teague* itself. The holding in *Teague* applies to new constitutional rules, *Teague v. Lane,* 109 S.Ct. at 1078, but the holding stems from an interpretation of the statutory scope of habeas corpus, and directly affects our power with respect to habeas petitions before us.

In summary, we hold, consistent with our opinion in *Dutton v. Brown,* that the rule in *Caldwell* falls within the "new rule" proscription of *Teague,* and, therefore, cannot be applied in this proceeding unless it falls within one of the two exceptions permitted by *Teague.*

### C.

■ The first exception in *Teague* relates to rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendant because of their status or offense. *Penry v. Lynaugh,* 109 S.Ct. at 2952. That exception does not apply.

The second exception relates to rules which require the observance of "procedures that ... are 'implicit in the concept of ordered liberty.'" *Teague v. Lane,* 109 S.Ct. at 1075, quoting *Mackey v. United States,* 401 U.S. at 693, 91 S.Ct. at 1180 (separate opinion of Harlan, J.) (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). *See Yates v. Aiken,* 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988). But the scope of the second exception is limited by the plurality opinion in *Teague* "to those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Teague v. Lane,* 109 S.Ct. at 1076–77. The procedures to which the plurality refers are bedrock procedures which are "central to an accurate determination of innocence or guilt." *Id.* at 1077. Presumably, the exception applies to the accuracy of the defendant's sentence as well, and to Eighth Amendment violations. *Teague v. Lane,* 109 S.Ct. at 1089 n. 5 (Brennan, J., dissenting).

Emphasizing the narrowness of the second exception the Court stated, "[w]e believe it unlikely that many such components of basic due process have yet to emerge." *Id.* at 1077. The rule urged must be "the kind of absolute prerequisite to fundamental fairness that is 'implicit in the concept of ordered liberty.'" *Id.* Its absence must "undermine the fundamental fairness that must underlie a conviction [or sentence] or seriously diminish the likelihood of obtaining an accurate conviction [or sentence]." *Id.*

Standing alone, a rule in capital hearings that no reference to appellate review can be made, or cannot be made without a full description of the appellate process, or that

---

*See Hopkinson v. State,* 708 P.2d at 47. Thus the issue of procedural bar is not before us.

We do not intend to imply that the availability of a constitutional claim can never be suggested

by state law. Quite the opposite might be true. Our conclusion in this case is confined to the constitutional claim in question.

curative instructions must follow references to appellate review, do not amount to Eighth Amendment bedrock procedural elements. However, speaking in the abstract, and not as to the fact situation before us, it strikes us as bedrock procedure that a jury must understand that it, not an appellate court, carries the responsibility for imposing the death penalty.

We describe the matter in general terms because of uncertainty as to the scope of *Caldwell* itself. But we do regard the jury's understanding of its core function in a capital sentencing hearing to be fundamentally related to the accuracy of a death sentence. A jury's basic misunderstanding of its responsibility dislocates the purpose of the entire proceeding, thus implicating " 'the principal concern' of [Supreme Court] jurisprudence regarding the death penalty, the 'procedure by which the State imposes the death sentence.' " *Caldwell v. Mississippi*, 472 U.S. at 340, 105 S.Ct. at 2645, quoting *California v. Ramos*, 463 U.S. at 999, 103 S.Ct. at 3452, and "the heightened need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. at 305, 96 S.Ct. at 2991. Because of its fundamental nature a *Caldwell* claim is different, for example, from one arising under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), where a prosecutor introduced victim impact evidence, or its extension in *South Carolina v. Gathers*, —— U.S. ——, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), where evidence of the victim's religious and civic inclinations was deemed improper.

Accordingly, while we acknowledge *Teague's* severe constraints on the scope of collateral review, we conclude that *Caldwell* claims fall within the second exception in *Teague*, regardless of how the exception may finally be defined, and can be considered. We note that the Fifth Circuit takes a different view. *See Sawyer v. Butler*, 881 F.2d 1273 (5th Cir.1989) (en banc).

## II.

### A.

The prosecutor's remarks which have placed the constitutionality of Hopkinson's death sentence in issue occurred during the prosecutor's summation to the jury in the second sentencing trial. The remarks to which Hopkinson assigns error in his en banc brief, together with the portions underscored in that brief, are as follows:

"Another matter, they talked about the possibility of error. There is no such thing as perfection. The system works to the best it can, *but there are safeguards built in.* That's due process. The Wyoming Supreme Court, as Mr. Munker said, reviewed the first trial. *They found no error in the guilt phase. That went to the United States Supreme Court, and it was denied cert.*

MR. SKAGGS: Objection, your Honor. There is flatly no evidence of that and if I can't bring in something there is no evidence of, he can't either.

MR. MORIARITY: Well—

THE COURT: Now, let me try and handle it. The jury has heard a lot of statements in closing arguments with reference to matters which technically there is no evidence on. And I won't talk about who said what, that's strictly up to you. *But I have given everybody latitude and I'm not going to stop now. The jury will just sift it out.*

MR. MORIARITY: Thank you, Your Honor. The testimony of Mrs. Barbara Oakley, the clerk of this court, when I asked her if the guilt phase had gone to the United States Supreme Court and had come back from them prior to this testimony, she said, yes, the record revealed that. That is the facts in this case. *But the Wyoming Supreme Court sent it back because of error in the first trial on the death penalty as it pertained to the Jeff Green matter. The Wyoming Supreme Court will review whatever action you take in this case. It's an automatic review. So, the matter of error, the matter of mistake is not one for us to be concerned with here.* Judge Ranck has done his best, his duty to instruct you on the law. We have given you the facts from the witness stand as best we can. You have to

do your duty as best you can, and I'm sure you will. *But, because of some possibility of error, they say don't give him the death penalty. That's not what the law is. It's nowhere in your instructions from the Court.* [Emphasis added.] Transcript of May 17, 1982 proceedings, Vol. XVI, pp. 1246–48."

Supplemental Reply Brief for Petitioner–Appellant on Rehearing En Banc at 7–8 (emphasis in original).

Notwithstanding the fact that the challenged statement by the prosecutor did not misstate (although it did not fully explain) Wyoming law, *see Dugger v. Adams,* 109 S.Ct. at 1214, Trans. of Oral Argument on Rehearing En Banc at 48, the court is equally divided as to whether the prosecutor's statement, taken in context, violated the rule in *Caldwell.* That is, the court cannot agree whether or not the prosecutor's statements were of the type which, when taken in context, "tend[ed] to shift the responsibility for the sentencing decision away from the jury." *Parks v. Brown,* 860 F.2d 1545, 1549 (10th Cir.1988) (en banc), *cert. granted,* —— U.S. ——, 109 S.Ct. 1930, 104 L.Ed.2d 402 (1989). The essentials of the opposing viewpoints on this subject are set out in the panel opinion and dissent, and it is unproductive to repeat and enlarge upon those arguments here because of the equal division of the court on the subject.

Our equal division has the effect of affirming the district court's denial of Hopkinson's petition on the *Caldwell* issue. While we could end our consideration of the case at this point, we choose not to do so. In order to make our views clear with respect to the proper test to be applied to *Caldwell* issues, and because further analysis does yield a decision in this case, we proceed with our analysis on the assumption that uncorrected *Caldwell*-type remarks were in fact made by the prosecutor.

### B.

■ Assuming *arguendo* that the prosecutor's statements were of the type which would violate the rule in *Caldwell,* the dis-

positive legal issue concerns the standard of review by which the prosecutor's remarks must be evaluated. In substance, the issue is whether Hopkinson's death sentence must be vacated because of the prosecutor's statement even if there is no substantial possibility that the remarks affected the jury's decision.

Hopkinson argues that by the following language in *Caldwell* the Supreme Court erected a "no effect" standard of review for *Caldwell* violations:

"In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. *Because we cannot say that this effort had no effect on the sentencing decision,* that decision does not meet the standard of reliability that the Eighth Amendment requires."

*Caldwell v. Mississippi,* 472 U.S. at 341, 105 S.Ct. at 2646 (emphasis added). Since it would be impossible for a reviewing court to say that a remark which violates the rule in *Caldwell* had no conceivable effect on a sentencing decision, however insignificant, Hopkinson acknowledges that as a practical matter the "no effect" standard amounts to a *per se* rule requiring reversal. Trans. of Oral Argument on Rehearing En Banc at 19–22.

We are not persuaded that the Supreme Court has erected a standard of review on this subject so formidable as to foreclose appellate review beyond a bare determination that an uncorrected remark falling within the *Caldwell* category has been uttered.

The opinion in *Caldwell* does not state that it is formulating a standard of review. It is in fact equivocal on the subject. In the paragraph preceding the one containing the "no effect on the sentencing decision" language, the Court employs a fundamental fairness standard: "Such comments, if left uncorrected, might *so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment.*" *Caldwell v. Mississippi,* 472 U.S. at 340, 105 S.Ct. at 2645 (emphasis added). The concurring and dissenting opinions evidence no recognition that a "no effect" or

*per se* reversal standard had been installed by the majority. Justice O'Connor, concurring in part and concurring in the judgment, uses "unacceptable risk." *Id.* at 343, 105 S.Ct. at 2647 (O'Connor, J.) The dissenting justices refer to "whether the statements rendered the proceedings as a whole fundamentally unfair." *Id.* at 350, 105 S.Ct. at 2650 (Rehnquist, J., dissenting).

"No effect" language has been used by the Supreme Court in two other cases without suggesting its use as a *per se* standard of reversal. In *Skipper v. South Carolina,* 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986), the Court stated: "Nor can we confidently conclude that credible evidence that petitioner was a good prisoner *would have had no effect* upon the jury's deliberations." (emphasis added). However, it followed that comment by saying: "Under these circumstances, it appears *reasonably likely* that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence. *Thus, under any standard,* the exclusion of the evidence was sufficiently prejudicial to constitute reversible error." *Id.* (emphasis added). In her concurring opinion in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 2334, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring), Justice O'Connor, joined by Justice Blackmun, identified the controlling standard in *Skipper* as "reasonably likely."

In *Hitchcock v. Dugger,* 481 U.S. 393, 399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987), the Court used "no effect" language but did so in connection with and as an alternative to harmless error: "Respondent has made no attempt to argue that this error was harmless, or that it had no effect on the jury or the sentencing judge."

Other opinions of the Supreme Court, dealing with Eighth Amendment issues, including concurring and dissenting opinions, have relied on standards which permit the exercise of some degree of judgment on appellate review. *See Gregg v. Georgia,* 428 U.S. 153, 188, 203, 96 S.Ct. 2909, 2932,

2939, 49 L.Ed.2d 859 (1976) (plurality opinion) ("substantial risk" standard for testing the constitutionality of death sentencing procedures); *Wainwright v. Goode,* 464 U.S. 78, 86, 104 S.Ct. 378, 383, 78 L.Ed.2d 187 (1983) ("degree" to which the process of balancing aggravating and mitigating factors was "infected" by a particular statutory provision); *Turner v. Murray,* 476 U.S. 28, 33, 106 S.Ct. 1683, 1686, 90 L.Ed.2d 27 (1986) ("constitutionally significant likelihood," or whether the circumstances "created an unacceptable risk"); *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1783, 95 L.Ed.2d 262 (1987) (Justices Brennan, Marshall, Blackmun and Stevens dissenting) ("substantial risk" and "significant probability" standards invoked); *Franklin v. Lynaugh,* 108 S.Ct. at 2338 (Stevens, J., dissenting) ("substantial risk" standard); and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384 (1988) ("substantial possibility," and "[t]he *possibility* that petitioner's jury conducted its task improperly certainly is *great enough* to require resentencing."). *Id.* 108 S.Ct. at 1870 (emphasis added). We note also that in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Supreme Court expressly rejected a no possible effect standard in a case where the jury was instructed on both invalid and valid aggravating circumstances, stating: "More importantly, for the reasons discussed above, *any possible* impact *cannot* fairly be regarded as a constitutional defect in the sentencing process." *Id.* at 889, 103 S.Ct. at 2749 (emphasis added) (footnote omitted).

The two circuits which have had occasion to address the appropriate standard for a *Caldwell* claim have reached different conclusions regarding the appropriate standard. In *Tucker v. Kemp,* 802 F.2d 1293, 1295–96 (11th Cir.1986) (en banc), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987), the Eleventh Circuit used a fundamental fairness approach derived from the prejudice prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It reviewed the challenged incident to determine whether there was " 'a reasonable probabil-

ity that, in the absence of the offending remarks, the sentencing outcome would have been different'.... A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Tucker v. Kemp*, 802 F.2d at 1295–96 (quoting *Tucker v. Kemp*, 762 F.2d 1480, 1483–84 (11th Cir.1985) (en banc)). In *Sawyer v. Butler*, 881 F.2d 1273 (5th Cir.1989) (en banc), the Fifth Circuit adopted a "no effect" test. It did so, however, in the context of a one-step analytical framework for determining the existence of *actual Caldwell* error:

> "As we shall see, the effect upon a death sentence of *Caldwell* error and the nature of the inquiry into whether it exists, including the record sources to be examined, are entwined parts of its very definition. That is, what a reviewing court is to look for and how it is to set about judging its effect upon a criminal conviction is part of the definition of *Caldwell* error. Much of the argument here is over the ingredients of the prohibition."

*Id.* at 1284. Our two-step approach[5] may cast the use of the governing standard into a different role. However, to the extent the Fifth Circuit's standard for evaluating the impact of *Caldwell*-type remarks on the sentencing decision differs from that which we adopt here, we respectfully disagree.

In our en banc decision in *Parks v. Brown*, 860 F.2d at 1557, this court adopted the *Mills v. Maryland* "substantial possibility" standard in a *California v. Brown*[6] issue relating to the impact on a jury of an instruction cautioning against sympathy. No different standard should be required here.

Of course, distinctions can be drawn between *"Caldwell"* and *"Brown"* issues. In the former, instructions or arguments

which successfully diminish the jury's sense of its responsibility infect the entire deliberation process. In the latter, only the jury's consideration of mitigating evidence is involved. But the latter more typically involves instructions from the court, and the influence of instructions on the jury (as opposed to remarks from counsel) arguably presents a more serious situation. More to the point, however, the focus in each instance is upon the reliability of the product of the jury's deliberation. In our view the proper standard for evaluating the *Caldwell* issue in this case, if a violation exists, is whether there is a substantial possibility that the prosecutor's statements, taken in context, affected the sentencing decision.

### III.

Applying the "substantial possibility" standard of review we have no difficulty holding that the remarks in question, assuming they fell within the category of remarks covered by *Caldwell*, did not unconstitutionally affect the sentencing decision.

The sentencing hearing in this case spanned a ten-day period and filled 1,270 pages of transcript. In addition to multiple exhibits, including those from the guilt phase of the trial, the state presented testimony from fifteen witnesses by transcript or in person, and the defense presented eight. The facts of this case are set out at length in the panel opinion and in the decisions of the Wyoming Supreme Court. The sentencing jury heard the essentials of that evidence, as well as other testimony which the guilt phase jury did not hear. We do not undertake to replicate the evidence here. Hopkinson's counsel vigorously attacked the credibility of key witnesses and the accuracy and reliability of key points of

---

**5.** In our recent en banc decision in *Parks v. Brown,* we describe a two-step process for evaluating a *Caldwell* issue:

> "A two-step inquiry is appropriate when examining alleged *Caldwell* violations. *See Darden v. Wainwright,* 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986). First, the court should determine whether the challenged prosecutorial remarks are the type of statements covered by *Caldwell.* In other words, they must be state-

ments that tend to shift the responsibility for the sentencing decision away from the jury. If so, the second inquiry is to evaluate the effect of such statements on the jury to determine whether the statements rendered the sentencing decision unconstitutional."

*Parks v. Brown,* 860 F.2d at 1549.

**6.** *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

evidence. However, the state's evidence relating to the aggravating and mitigating factors in the case overwhelmingly established Hopkinson's capacity to be an intimidating, violent, manipulative individual. His full responsibility for procuring the bombing murder of the Vehar family, and the torture murder of Jeff Green was before the jury.

The jury was told repeatedly about its duties, the gravity of its role, and that the remarks of counsel were not to be considered as evidence or legal instruction in the case. R.Vol. IX–A at 4, 17, 33, 35, 36, 63, 65, 72–74, 81; R.Vol. IX–F at 1164, 1169, 1200, 1202–04, 1207, 1212–13, 1237–38, 1242, 1244, 1252. The court formally instructed the jury members in no uncertain terms that they bore the full responsibility and were the *final* decision-makers on the death penalty:

> "You should not act hastily or without due regard for the gravity of these proceedings. Before you ballot, you should carefully weigh, sift and consider the evidence and all of it and bring to bear your best judgment upon the sole issue which is submitted to you at this time: Whether the defendant shall be sentenced to death or to life imprisonment.

> Your decision as to the sentence to be imposed is mandatory. You are not merely recommending a sentence to the Judge. *You are the final decision-makers as to whether Mark Hopkinson will be sentenced to life in prison or to death.*"

R.Vol. VI–H at 699 (emphasis added). A written copy of those instructions was given to each juror to take into the jury room for assistance in their deliberations. R.Vol. IX–F at 1162.

In its decision the jury separately found that every one of the five aggravating circumstances posed to the jury were proved, beyond a reasonable doubt, that *none* of seven statutory mitigating circumstances were present, and of the two additional mitigating circumstances, one was present and one was not.[7] On those separate, strong findings the jury recommended the death sentence.

After a thorough review of the record we are convinced that there is no substantial possibility that the comment by the prosecutor unconstitutionally affected the decision of the jury. We reach the same conclusion if we apply a fundamental fairness standard. That is, the challenged comments did not render the sentencing pro-

---

7. The jury found as follows:

"THE CLERK: Findings and recommendation of sentence. We, the jury, empaneled and sworn in the above-entitled case, do, upon our oaths, find as follows:

Part I: Aggravating Circumstances.

1. The murder was committed by a person under sentence of imprisonment. Yes.

2. The defendant was previously convicted of another murder in the first degree. Yes.

3. The murder was committed for the purpose of avoiding or preventing a lawful arrest. Yes.

4. The murder was committed for pecuniary gain. Yes.

5. The murder was especially heinous, atrocious or cruel. Yes.

Part II: Mitigating Circumstances.

1. The defendant has no significant history of prior criminal activity. No.

2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. No.

3. The victim was a participant in the defendant's conduct or consented to the act. No.

4. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor. No.

5. The defendant acted under extreme duress or under the substantial domination of another person. No.

6. The capacity of the defendant to appreciate the criminality of his conduct, or to conform his conduct to the requirements of law, was substantially impaired. No.

7. The age of the defendant at the time of the crime. No.

8. Any other mitigating circumstances.

9. The torture of Jeff Green may not have been ordered by Mark Hopkinson. No.

10. Actions of Mark Hopkinson helped save the life of a prison guard. Yes.

Part III. Recommendation. That sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and the jury recommends that the defendant be sentenced to death."

R.Vol. IX–F at 1264–65.

ceeding and death sentence fundamentally unfair on the facts of this case.

## IV.

## CONCLUSION

We have considered all of the arguments of counsel. Because we hold that Hopkinson's death sentence was not imposed unconstitutionally, we affirm the district court's denial of the writ of habeas corpus on this issue.

AFFIRMED.

LOGAN, Circuit Judge, with whom Chief Judge HOLLOWAY and Judges McKAY and SEYMOUR, join, dissenting:

I agree with the majority opinion that we have a "new" rule within the contemplation of *Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). I would add, because I differ with the majority on the standard of review contemplated by *Caldwell v. Mississippi*, 472 U.S. 320, 341, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985), that it is *Caldwell*'s "greatly heightened intolerance of misleading jury argument," *Sawyer v. Butler*, 881 F.2d 1273, 1291 (5th Cir.1989) (en banc), which clearly makes it a new rule.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), had been settled law for over ten years before *Caldwell* was decided. *Donnelly* held that due process does not require the reversal of a conviction based on alleged improper remarks of the prosecutor unless the remarks constituted fundamental unfairness to the defendant. Thus, if *Caldwell* applied that or a significantly similar standard (even in the context of an Eighth Amendment challenge), it would be difficult to say that *Caldwell* was not dictated by *Donnelly* precedent. Cases dictated by precedent cannot espouse "new" rules under *Teague*. 109 S.Ct. at 1070. Thus, it is the standard of review articulated in *Caldwell* that makes it "new," under the *Teague* analysis.

I also agree with the majority that *Caldwell* error falls within the second exception of *Teague* and *Penry*. The jury's perception of its position in the criminal justice system, when it has discretionary power to put a defendant to death, is central to the reliability of the sentence—hence it is a procedure "implicit in the concept of ordered liberty." *Teague*, 109 S.Ct. at 1075. The majority's analysis on this issue is better than that of the *Sawyer* majority which found to the contrary. 881 F.2d at 1292–94.

We are equally divided on the issue whether there is *Caldwell* error in the case at bar. I remain persuaded that the prosecutor's remarks in the rebuttal part of his closing argument immediately before the case was submitted to the jury constituted *Caldwell* error. I can add little to my analysis in my dissent to the panel opinion, *Hopkinson v. Shillinger*, 866 F.2d 1185, 1233–37 (10th Cir.1989), and do not repeat it here.

Where I differ from the majority is on the standard of review that we must apply to *Caldwell* error. The Supreme Court concluded in *Caldwell*, "[b]ecause we cannot say that this effort [prosecutor's improper argument] had *no effect* on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." 472 U.S. at 341, 105 S.Ct. at 2646 (emphasis added). The majority here says essentially that the Supreme Court did not mean what it said in *Caldwell*, and did not intend to create such a tough standard of review. The majority equates a "no effect" standard with a per se reversal rule and then discusses a number of cases it considers analagous in which the Supreme Court used different words to describe the review standards in those situations.

I do not agree that the Supreme Court inadvertently used the "no effect" words or intended something different than the high standard of review indicated by those words. The writer of the majority opinion in *Caldwell*, in dissenting to a denial of certiorari in *Moore v. Blackburn*, 476 U.S. 1176, 106 S.Ct. 2904, 90 L.Ed.2d 990 (1986)

(denying cert. to 774 F.2d 97 (5th Cir.1985)), stated that under the court's recent *Caldwell* decision the petitioner's sentence could not stand unless the error "had no effect on the sentencing decision." 476 U.S. at 1176, 106 S.Ct. at 2904 (Marshall, J., dissenting). The dissenters in *Caldwell* itself were fully aware that a "no effect" standard was being articulated in the majority opinion. Justice Rehnquist, writing for the dissenters, objected to two facets of the majority opinion: (1) the majority's conclusions about the misleading effect of the prosecutor's statements, taken in context, and (2) the imposition of the "no effect" test (what the dissent saw as the exaggeration of the likelihood of actual prejudice). In speaking to the second objection, the dissent criticized the majority's *failure* to apply the "fundamental fairness" test of *Donnelly*. The dissent further clarified its disagreement with the majority stating, "[a]lthough the Eighth Amendment requires certain processes designed to prevent the arbitrary imposition of capital punishment, it does not follow that every proceeding that strays from the optimum is *ipso facto* constitutionally unreliable." *Caldwell*, 472 U.S. at 350–51, 105 S.Ct. at 2650–51 (Rehnquist, J., dissenting).[1]

I believe the Supreme Court's recent decision in *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), recognized and reinforced the "no effect" standard as applied to *Caldwell* error in the sentencing phase of a capital murder trial. *Darden,* which involved prosecutor's comments during the guilt phase, distinguished *Caldwell,* stating:

"The principles of *Caldwell* are not applicable to this case. *Caldwell* involved comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, that it would automatically be reviewed by the State Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them....

... In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing.... *Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. In this case, none of the comments *could have had the effect of misleading the jury* into thinking that it had a reduced role in the sentencing process."

477 U.S. at 183 n. 15, 106 S.Ct. at 2472 n. 15 (emphasis added).

All fourteen of the active judges in the Fifth Circuit agree that the Supreme Court, in *Caldwell,* intended to adopt a "no effect" test. In the *Sawyer* opinion on en banc rehearing, that court extensively analyzes why *Caldwell* sets out such a high standard, when the Supreme Court considers the fundamental fairness standard sufficient to protect the defendant's rights in other situations. After that analysis the *Sawyer* court concludes:

"The state cannot resist the conclusion that it improperly diminished a jury's sense of responsibility in its sentencing role with the argument that a jury with such diminished responsibility nonetheless did not render the proceedings fundamentally unfair.

. . . .

[*Caldwell*] instructs that if the State seeks 'to minimize the jury's sense of responsibility for determining the appropriateness of death' and 'we cannot say that this effort had no effect on the sentencing decision,' then 'that decision does not meet the standard of reliability

---

1. The majority in the case at bar suggests that although *Skipper v. South Carolina,* 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986), uses the "no effect" language it also does not adopt that as a standard. It does use other language including "under any standard." But I believe it adopts a "no effect" standard of review for er-

rors in the admission of mitigating evidence in a death sentencing proceeding by stating, in the crucial paragraph of the opinion: "Nor can we confidently conclude that credible evidence that petitioner was a good prisoner would have had *no effect* on the jury's deliberations." *Id.* at 8, 106 S.Ct. at 1673 (emphasis added).

that the Eighth Amendment requires.'
...

In sum, we reject [the State's] proffered definition of *Caldwell.* We do so after noting that its core is diminishing the responsibility of the jury by misdescribing its role under state law and after rejecting the suggestion that its elements include showings of fundamental unfairness, a contemporaneous objection or trial court participation."

*Sawyer,* 881 F.2d at 1285–86 (quoting *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646).

The "substantial possibility" test the majority in the instant case adopts smacks too much of preponderance-of-the-evidence.[2] While I said in my dissent to the panel opinion that the "no effect" test *approaches* a per se rule of reversal, I did not mean that it *is* a per se reversal rule. Rather the test seems to be akin to a beyond-a-reasonable-doubt standard.

In *Caldwell,* the Court did not require the petitioner to prove actual prejudice; indeed, the limitations of the appellate process and the rules against polling jurors would effectively preclude any such proof. Rather, *Caldwell* evaluated, in the context of the prosecutor's argument and the court's instructions to the jury, the inherent tendency of the improper remarks "to minimize the jury's sense of responsibility for determining the appropriateness of death." 472 U.S. at 341, 105 S.Ct. at 2646. When that Court said that violations can be overlooked only if a reviewing court can conclude with confidence that they had "no effect on the sentencing decision," *id.,* it meant, I believe, that reviewing judges should ask themselves if they are convinced beyond reasonable doubt, considering the context, admonitions of the trial judge and other circumstances, that the improper remarks did not affect the sentencing decision.

**2.** Additionally, it seems to me that the issue of the likelihood of the prosecutor's remarks actually having affected the sentencing decision is largely subsumed in the initial determination of whether *Caldwell* error has, in fact, occurred. A close evaluation of the entirety of the prosecutor's argument and the statements and instructions of the trial judge are necessary to deter-

If I ask myself whether there is a "substantial possibility" the prosecutor's *Caldwell* remarks affected the jury's decision to sentence Hopkinson to death I must say no—they probably did not affect the jury's decision. But if I ask myself whether I am so convinced beyond a reasonable doubt my answer is not the same. I cannot say *with confidence* that the prosecutor's remarks had no effect on the jury's sentencing decision. Therefore, I would hold that Hopkinson's death sentence was imposed in violation of the Eighth Amendment and must be vacated.

mine whether the prosecutor's remarks, *taken in context,* would tend to provide the jury with a misleading perception of its role. When viewed in this light, it becomes apparent that many objections to the no effect standard (including those of the *Caldwell* dissent) are actually better analyzed as objections to finding the presence of *Caldwell* error at all.